**Muhammad AL–MAHDI, Appellant,**

v.

**UNITED STATES, Appellee.**

Nos. 00–CF–1684, 02–CO–334.

District of Columbia Court of Appeals.

Argued Sept. 23, 2003.
Decided Feb. 10, 2005.

Kenneth H. Rosenau, Washington, DC, appointed by the court, for appellant.

David C. Woll, Jr., Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, June M. Jeffries,

George P. Eliopoulos and Jeannie S. Rhee, Assistant United States Attorneys, were on the brief for appellee.

Before RUIZ, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Muhammad Al–Mahdi was found guilty after a jury trial of voluntary manslaughter while armed and possession of a firearm during a crime of violence. After his sentencing, appellant moved to set aside his convictions on the basis of ineffective assistance of counsel. The trial judge denied that request. In this consolidated appeal, appellant raises several claims of error, the foremost of which are first, that he was entitled to a mistrial after a juror received an extra-judicial communication during deliberations, and second, that his trial counsel was ineffective in not moving to suppress his confessions on Fourth Amendment grounds. Appellant's arguments do not persuade us, and we affirm his convictions.

## I.

According to the evidence adduced at trial, appellant's mother, Nailah Al–Mahdi, called 911 early on the morning of March 17, 1999, to report that a man had been shot in her home in Northeast Washington, D.C. Metropolitan Police Department (MPD) Officer Darnell Benton, the first of several officers responding to the scene, arrived while Ms. Al–Mahdi was still on the phone with the dispatcher. As Officer Benton knocked on the front door, he heard Ms. Al–Mahdi ask "Muhammad" to let him in.[1] For several minutes, however, no one opened the door. Officer Benton

---

1. The tape of the 911 call confirms that Ms. Al–Mahdi repeatedly urged appellant to open the door for the police.

continued to knock until, finally, Ms. Al–Mahdi let him in.

Officer Benton entered and saw the body of William Marshall lying face down on the floor in a pool of blood. Ms. Al–Mahdi was too "hysterical" at this point to tell Officer Benton what had occurred. The officer then noticed appellant standing against a nearby wall. Startled, Officer Benton grabbed appellant and asked him what had happened. Appellant, who was "much calmer than his mother," responded by saying, "he tried to hurt my mother." Officer Benton immediately handcuffed appellant and directed another officer to put him in a police cruiser.

Meanwhile, Ms. Al–Mahdi was still on the phone frantically trying to summon medical assistance for Marshall. MPD Officer Regina Grier told Ms. Al–Mahdi that help was on the way but that she needed to find the weapon that had been used in the shooting. Ms. Al–Mahdi then handed Officer Grier a towel that she was holding. Wrapped inside the towel was a semi-automatic pistol.

Detective Daniel Whalen, the lead detective assigned to the case, arrived as Marshall was being taken away in an ambulance.[2] Detective Whalen saw appellant sitting in the back of a patrol car "in custody" and perceived him to be already under arrest.[3] Officers who had arrived at the scene before Detective Whalen told him that Ms. Al–Mahdi had "implicated

her son as being responsible" for the shooting and that appellant was "now in police custody." The detective directed that appellant be transported to the office of the homicide branch at police headquarters.

At the homicide branch, appellant was interrogated by Detective Eric Gainey. Waiving his Fifth Amendment rights, appellant told Detective Gainey that he shot William Marshall in self-defense while trying to break up a violent argument between Marshall and his mother. After taking appellant's statement, Detective Gainey met with Detective Whalen, who by this time had interviewed Ms. Al–Mahdi himself. Detective Whalen reported that Ms. Al–Mahdi denied having been in an argument with Marshall. She told the detective that her son was angry that she was "entertaining" Marshall, provoked an altercation with him, and "basically was very upset and went off." Detective Gainey returned to appellant and told him that his account conflicted with what his mother said. Appellant then admitted that he was upset that Marshall was going to spend the night with his mother and shot him after Marshall refused to leave or back down as the argument escalated.[4]

Appellant was charged in a three-count indictment with first-degree murder while armed, possession of a firearm during a crime of violence (PFCV), and carrying a pistol without a license (CPWL). His mo-

---

2. Marshall died in the hospital later that day as a result of gunshot wounds to his head.

3. Detective Whalen was called at trial as a prosecution witness and testified on direct examination as follows:

> ·Q. And when you arrived on the scene, had anyone been arrested in connection with the shooting?
> A. Yes.
> Q. And who was that person?
> A. Muhammad Al–Mahdi.

Q. And did you come in contact with Mr. Al–Mahdi at 914 15th Street?
A. I saw him briefly. He was in the back of the patrol car. I did not speak to him or interview him at that point but just merely saw that he was in custody.

4. When appellant was escorted to a cellblock after his interrogation concluded, he broke down and exclaimed, "Why did I do this? I can't believe I did this. I lost it. I just lost it. . . . I brought disrespect into my mother's house. I didn't need to do this."

tion to suppress his statements to the police as having been taken without a valid waiver of his *Miranda*[5] rights was denied after a hearing. At trial, appellant repudiated his confessions, claiming that he had lied in order to protect his mother from being charged with Marshall's murder. The jury acquitted appellant of first-degree murder while armed but found him guilty of the lesser-included offense of voluntary manslaughter while armed. In addition, the jury found appellant guilty of PFCV but acquitted him of CPWL.

Appellant appealed his convictions and, a few months later, filed a motion pursuant to D.C.Code § 23–110 (2001) to set aside his convictions on the basis of ineffective assistance of trial counsel. Appellant charged that his trial counsel was ineffective in failing to move to suppress his statements to the police on the ground that he was taken into custody for questioning without probable cause in violation of the Fourth Amendment. Based on the record of the trial and the pretrial motions hearing, the trial judge denied appellant's § 23–110 motion in a written opinion without a hearing. Appellant filed a timely notice of appeal from that denial. His two appeals have been consolidated and are now before us.

## II.

Appellant's primary argument in his direct appeal—and the only one that merits extended discussion—is that the trial judge should have granted his motion for a mistrial upon learning that a juror was contacted about the case during deliberations. We are persuaded otherwise. Once the judge was informed of the contact, he conducted a thorough voir dire of all the jurors and concluded that the incident did not imperil appellant's right to a fair and impartial jury. We approve of the judge's careful handling of the matter and are satisfied that he did not abuse his discretion in denying a mistrial.[6]

### A.

On the second day of jury deliberations, the trial judge informed the parties that he had received a note earlier that morning from a juror. The note read as follows: "Judge, I was approached by a cousin of the Defendant and asked if I was going to find her cousin guilty or his mom. Juror 561." With the parties' agreement, Juror 561 was brought into the courtroom so that the judge and the parties' counsel could question her on the record about the incident. In response to the judge's questions, the juror said that on the previous evening, while she was standing at a bus stop near the courthouse, she was approached by two unfamiliar persons, a teenage girl and her mother. The teenager asked the juror, "What are you going to do? Are you going to find my cousin guilty, him or his mother?" Receiving no reply, the girl repeated her question. Her mother then admonished the girl to leave Juror 561 alone, saying, "She can't talk about that." The girl obeyed the admoni-

---

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. Appellant also contends that he is entitled to a new trial on account of improprieties in the prosecutor's cross-examination of a defense witness and in the prosecutor's closing argument. The alleged missteps mainly consisted of (1) badgering the witness by repeatedly asking the same question to get a responsive answer, and (2) appealing to the jury's emotions by describing appellant's mother as a "tragic figure" and stating that "[n]o one would ... want to be in her shoes. No one would want to trade places with [her]." The cited utterances strike us as inconsequential even in the aggregate. Assuming *arguendo* that the trial judge might have sustained proper objections to them, proper objections were not lodged. The judge did not commit plain error by not intervening *sua sponte*.

tion and stopped speaking to Juror 561. When the bus arrived at the stop, Juror 561 boarded it, leaving her teenage inquisitor behind.[7]

Although, as the judge confirmed, nothing overtly threatening was said to her, Juror 561 "felt threatened" and was "really scared" by the confrontation she described. Later that evening, Juror 561 went to her church and asked her fellow congregants to pray for her. She then spent a sleepless night before getting up and coming to court.

Upon further questioning, Juror 561 told the judge that, while the episode had made her "very frightened," she believed that she could go on deliberating with her fellow jurors without being biased or leaning toward one side or the other. "I think I can perform my duty," she stated. "[W]e had started deliberating yesterday and we're doing pretty good now. So I don't think anything will interfere with my judgment."

In response to additional questions from the judge, Juror 561 disclosed that she had informed all the other jurors about her encounter and told them that it had frightened her. They responded that she should inform the judge, which she did by writing her note.[8]

Appellant's counsel had no additional questions for the juror. The prosecutor asked Juror 561 whether she believed the teenager had questioned her "on behalf of" either appellant or his mother. "Oh, no. I don't know," the juror responded, "I just

thought perhaps they [were] in the courtroom and maybe saw me, I don't know, because I left kind of late."

Juror 561 was allowed to return to the jury room. Appellant's counsel then moved for a mistrial. The judge denied the motion, deeming it premature to grant a mistrial before asking the other jurors how they had been affected by Juror 561's report.

Each of the remaining eleven jurors was then brought into the courtroom, one at a time, for individual questioning at the bench. All of the jurors acknowledged that Juror 561 had told them about her encounter with the teenage girl who purported to be appellant's cousin. The judge told the jurors that the evidently unplanned, "happenstance" act by a "concerned relative" could not be attributed to either appellant or his mother. All of the jurors assured the court that they would disregard the incident and that it would not affect their ability to be fair to both sides in their deliberations. Each juror denied being unnerved or bothered by the incident (e.g., "It hasn't affected me at all"; "I don't feel intimidated at all .... It never crossed my mind.").[9]

Several jurors, however, mentioned that Juror 561 was very upset. At least one juror, in response to a question about her own ability to set this episode aside and be fair to both sides, implicitly questioned whether Juror 561 retained that ability:

> I think I could. I just know that this woman [i.e., Juror 561] was—she

---

7. The girl's mother also boarded the bus. Juror 561 evidently had no further contact with her.

8. Juror 561 was apologetic about having mentioned the contact to the other jurors and expressed chagrin that by doing so she might have "biased the trial."

9. One juror, asked by the judge if he felt "intimidated or afraid in any fashion as a

result of this incident," answered, "Only slightly. I think I can—I think I can still be objective." The judge told the juror that he would not continue to serve if he felt intimidated. The juror responded that he could keep the incident in perspective and uphold his oath to be fair to both sides. Neither counsel had any questions.

seemed very shook up. So I can't speak for her. All I can speak for is myself; and for the other jurors, people seem to be level-headed. She just really seems really scared. So, for me, it's not a problem. I don't know, for this woman, if it's a problem.

After the *voir dire* of the eleven other jurors, the judge called Juror 561 back to the bench for additional questioning. Emphasizing that "there's no evidence, zero evidence" that appellant or anyone else involved in the case "had anything to do with this chance encounter by this teenager," the judge asked Juror 561, "are you able to completely put it outside your mind and judge this case just on what you heard?" The juror answered in the affirmative. The judge repeated the question: "Do you feel you could do that?" Juror 561 said, "Yes, sir." The judge then told Juror 561 that he knew she was "upset this morning about the incident." He reassured her that she should not "feel bad" about being upset or about having told the other jurors what happened. Then, stating that "each person needs to search themselves and feel that they can be fair," the judge repeated his direct inquiry of Juror 561:

> JUDGE: .... Do you feel you can be fair to both Mr. Al–Mahdi and the prosecution in this case now?
>
> JUROR: Yes, sir.
>
> JUDGE: Do you feel in any way that you'd be more likely to find Mr. Al–Mahdi guilty because of this incident?
>
> JUROR: No, sir.
>
> JUDGE: Do you feel in any way you'd be more likely to find him not guilty because you're afraid of some con-

sequence that might happen if you do find him guilty of something?

> JUROR: No. I feel pretty secure, especially after my prayer with my preacher last night with my God.
>
> JUDGE: And you feel you could proceed and continue on as a juror in this case?
>
> JUROR: Yes, sir.
>
> JUDGE: Counsel, any questions?
>
> PROSECUTOR: No, Your Honor, I don't. Thank you.
>
> DEFENSE COUNSEL: No questions. Thank you.

After this questioning, Juror 561 returned to the jury room. Appellant's counsel stated that had the alternate jurors not been dismissed,[10] she would have asked that Juror 561 be excused. "I am concerned," counsel said, "about the other jurors' description of how emotional she was this morning as she described the incident." Appellant's counsel was disinclined, however, to go forward with fewer than twelve jurors.[11] Accordingly, counsel renewed her request for a mistrial.

The prosecutor opposed that request. "This is a context," he commented, "in which you [i.e., the trial judge] have a unique ability to be within four feet of each of the jurors," observe their demeanor, and assess the credibility of their responses. Because of that advantage, the prosecutor argued, a "substantial record" had been made reflecting each juror's ability to be fair—Juror 561 included, given the judge's final colloquy with her.

The trial judge denied appellant's motion for a mistrial. He remarked that, after having interviewed each of the ju-

---

**10.** The trial began with fourteen jurors. During the government's case-in-chief, two jurors were "excused from further service" with the agreement of the parties. The trial proceeded with a panel of twelve.

**11.** *See* Super. Ct.Crim. R. 23(b). "I am not a fan of eleven-person juries deliberating," appellant's counsel stated, "so I would not ask that the Court just discharge [Juror 561] and let the balance of the jury deliberate."

rors, he was "greatly impressed with their intelligence and their maturity and their understanding of the situation" at hand. He found that none of the jurors manifested any bias; Juror 561, in particular, he concluded, "will not be biased for or against either side in this trial." "Now, perhaps," the judge added, "in an abundance of caution under Rule 23, I might have considered excusing her, but since the Defense is not seeking her removal under Rule 23, I certainly wouldn't strike her."[12]

Next, the judge declared that he would call the jury back into the courtroom for one more instruction on the matter, in order to give the jurors "one last chance to evidence some type of reluctance to go forward." Reseated in the jury box, the jurors listened as the judge reviewed the *voir dire* he had conducted with them to make sure they would disregard the "apparent chance encounter of a female teenager with one of our jurors." Once again the judge informed the jury that there was no evidence that appellant or anyone else associated with the case had any connection to the encounter. Then the judge said that he had "one final thing" to ask:

> Now, let me just ask one final thing. I'm instructing you, as a matter of law, to completely disregard that incident and judge this case completely on the facts and the law as you've heard in this courtroom.
>
> Let me ask one final question collectively. Is any member of the jury—now having some time to think about what has happened today, does anyone feel that you would not be able to set this matter aside and be fair to both sides? If you feel you won't be able to be fair, raise your hand.

There was no response, and the judge permitted the jury to resume its deliberations. The jury returned its verdicts on the afternoon of the following day.

**B.**

Appellant's right to an impartial jury was in jeopardy when Juror 561 reported during deliberations that she felt threatened and was frightened by her extrajudicial contact with appellant's putative cousin. How, appellant reasonably demands to know, can an admittedly fearful juror be impartial? How, for that matter, can we be sure that the other jurors, who learned of the contact and observed Juror 561's anxiety, were not "tainted" as well?

▬▬ "Where, as here, the impartiality of a juror has been plausibly called into question, it is the responsibility of the trial judge to hold a hearing to determine whether the allegation of bias has merit." *Medrano–Quiroz v. United States,* 705 A.2d 642, 649 (D.C.1997). The judge must conduct "a thorough inquiry ... into whether the defendant suffered *actual* prejudice." *Hill v. United States,* 622 A.2d 680, 684 (D.C.1993) (emphasis in the original); *see also Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). "[W]here, following a hearing, the defendant has established a substantial likelihood of actual prejudice from the unauthorized contact, ... 'all reasonable doubts [about the juror's ability to render an impartial verdict must] be resolved in favor of the accused.'" *Hill,* 622 A.2d at 684 (quoting *United States v. Williams,* 262 U.S.App. D.C. 112, 128, 822 F.2d 1174, 1190 (1987)); *accord, Medrano–*

---

12. The judge also took special note of the juror who initially described himself as "slightly" intimidated. See note 9, *supra.* "Upon further discussion with him," said the judge, "I became convinced, observing his credibility and his demeanor, that he could completely set this aside."

*Quiroz*, 705 A.2d at 650. Thus, upon a *prima facie* showing of juror bias or partiality, "it is the government's burden to demonstrate that the juror's contact with extraneous information was harmless or non-prejudicial." *Hill*, 622 A.2d at 684. To go forward with the trial, the evidence of record must justify a high degree of confidence that the likelihood of juror partiality has been rebutted. "If the government does not meet its burden, then the court is obliged to declare a mistrial," *Parker v. United States*, 757 A.2d 1280, 1287 (D.C.2000), or, if possible, to grant other adequate relief (such as excusing the affected juror).

■■■■■ "[T]he extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse." *Leeper v. United States*, 579 A.2d 695, 699 (D.C.1990).[13] As in this case, it is usually appropriate for the judge to take charge of the inquiry and to take the initiative in questioning jurors and eliciting the facts. *See Butler*, 262 U.S.App. D.C. at 134, 822 F.2d at 1196 ("The burden of establishing harmlessness, which is placed on the government, is made less demanding by the trial judge's participation and use of all the tools necessary to evaluate the relevant facts."). Generally speaking, though, the parties must be afforded notice of any juror contact, together with a fair opportunity to help "fashion the proper inquiry" and pose appropriate questions of their own. *Hill*, 622 A.2d at 686. "An assessment of juror bias [may] require[ ] consideration of a number of factors, including the nature of the communication, the length of the contact, the possibility of removing juror taint by a limiting instruction, and the impact of the communication on both the juror involved and the rest of the jury." *Williams*, 262 U.S.App. D.C. at 126–27, 822 F.2d at 1188–89 (footnotes omitted); *see also Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 98 L.Ed. 654 (1954) (stating that the court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial"). A juror's assurance of impartiality has probative value, *see Smith*, 455 U.S. at 217 n. 7, 102 S.Ct. 940, though it is, of course, not necessarily conclusive. *Hill*, 622 A.2d at 685.[14]

13. There is, for example, "no per se rule that individual questioning [of each juror] is always required," regardless of the extent of the contact in question. *Williams*, 262 U.S.App. D.C. at 127, 822 F.2d at 1189. "[T]he trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence." *United States v. Butler*, 262 U.S.App.D.C. 129, 134, 822 F.2d 1191, 1196 (1987).

14. The inquiry is a delicate one, particularly with regard to the impact of the contact on the juror. Generally speaking, the examination should "not intrude on the jury's substantive deliberations." *Shotikare v. United States*, 779 A.2d 335, 340 (D.C.2001). If the examination is conducted after the jury has rendered its verdict, the rules governing juror impeachment of verdicts are particularly restrictive. At that point, "[a] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated on his mind." *Khaalis v. United States*, 408 A.2d 313, 359 (D.C.1979) (quoting *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892)); *see also United States v. Williams–Davis*, 319 U.S.App.D.C. 267, 273, 90 F.3d 490, 496 (1996) ("The exception [in Federal Rule of Evidence 606(b) ] for improper outside influence allows testimony about the fact and nature of the contact (the input, as it were), but not about the effect it produced on the juror's state of mind."). *Cf. Rushen v. Spain*, 464 U.S. 114, 121, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). Thus, the juror examinations in the case now before us necessarily would have been narrower in scope had they been conducted after the jury had rendered its verdict. The pre/post-verdict distinction can be attributed to the differing policies governing the respective inquiries

■ "[F]ollowing a proper hearing, the determination of juror bias or prejudice [also] lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, ... and the findings of fact underlying that determination are entitled to great deference." *Leeper,* 579 A.2d at 698 (quoting *Washington v. Washington Hospital Center,* 579 A.2d 177, 185 (D.C.1990) (internal quotation marks and citations omitted)). "Our review is deferential because the question of prejudice turns substantially on the judge's appraisal of the juror's demeanor ... and is therefore one about which the trial judge is 'especially qualified to render a sound opinion.'" *Id.* (quoting *Waller v. United States,* 389 A.2d 801, 805 (D.C. 1978)). Inasmuch as "[t]he substance of the ex parte communications and their effect on juror impartiality are questions of historical fact," *Rushen,* 464 U.S. at 120,

104 S.Ct. 453, we must accept the trial court's findings thereon unless those findings are clearly erroneous. *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The trial judge should, of course, undertake to ensure an adequate record, with appropriate factual findings and conclusions, to facilitate appellate review. Even though review is deferential, we will not hesitate to find reversible error if the record does not support the trial judge's decision. *See, e.g., Hill, supra.*

The question before us in the present case, therefore, is whether the trial judge abused his discretion in coming to the conclusion that Juror 561, and the jury as a whole,[15] would render an impartial verdict. We think not. We are persuaded, to the contrary, that the judge conducted a

---

and restrictions thereon. While a pre-verdict inquiry serves a purpose similar to that of *voir dire,* i.e., discerning potential juror bias to prevent a tainted verdict, a post-verdict inquiry serves to impeach the verdict already rendered. *See Khaalis,* 408 A.2d at 359 (citing *Sellars v. United States,* 401 A.2d 974, 981–82 (D.C.1979)). The general prohibition on jurors impeaching their verdict is intended to: (1) discourage harassment by losing parties attempting to set aside the verdict; (2) encourage free and open discussion among jurors; (3) reduce incentives for jury tampering; (4) promote verdict finality; and (5) maintain "the viability of the jury as a judicial decision-making body," *id.* – goals that are largely inapplicable before a verdict is reached.

15. In the trial court, appellant never questioned the judge's determination as to any jurors other than Juror 561. On appeal, however, appellant argues that a mistrial was required not only because Juror 561's own impartiality was compromised, but also because the entire jury was "contaminated" by hearing her report of her encounter. This latter claim is subject to review only for "plain error." *See United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508

(1993) (applying plain error standard to unpreserved claim that alternate jurors were permitted, improperly, to be present during jury deliberations). Appellant predicates his "contamination" argument in part on the judge's supposed failure to warn jurors at the start of trial against discussing any extrajudicial communications they might receive with their fellow jurors. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 1.03, 1.05 (4th ed. 1993). Appellant is factually mistaken. Although the judge did not give the standard instructions verbatim, he correctly and without objection instructed the jurors as follows on what to do if contacted by persons outside the courtroom:

> If at any time during the course of the trial someone wants to talk to you about the case, you should refuse to participate or listen to the discussion.... I'd like to set forth a process that I'd like you to follow in the unlikely event that something unusual occurs outside the courtroom while this trial is going on.... [T]he first step of the process [is to] [l]et me know something unusual has occurred. The second step is please don't let your fellow jurors know that something unusual has occurred outside the courtroom. Just let me know about it [through a note].

proper investigation and that his findings of fact were supported by the evidence.

To begin with, the *voir dire* examination was thorough and probing. The judge personally questioned every juror, and counsel for both parties were free to question each juror as well. The inquiry of Juror 561 explored the details of the extrajudicial contact, how she interpreted the incident, how it affected her, what she did in reaction to the contact, what she reported to her fellow jurors, and whether she believed she still could be an impartial juror. The inquiry of the other jurors similarly elicited what they had learned from Juror 561, how she appeared to them, how they themselves reacted to the incident, and whether the episode affected their own impartiality. The judge emphasized the importance of an unbiased jury and pressed Juror 561 and the other jurors to be sure that they would be unbiased. Further, by stressing repeatedly that no reason existed to connect appellant (or anyone else involved in the trial) with Juror 561's "chance encounter" with appellant's teenage cousin, the judge helped the jurors put the incident in perspective and defused the risks that they would feel intimidated or would view the contact as an attempt by appellant to intrude on their deliberations. The judge persistently confronted Juror 561 in particular about whether her fearfulness impaired her ability to be impartial. He worked to overcome any reluctance on her part to give a candid answer by acknowledging her legitimate concerns and assuring her that she should not "feel bad" about anything she had done. The reiteration by the judge of his questions was calculated to impress all the jurors with the gravity of the inquiry and to enhance the judge's ability to evaluate their responses. This repetition also afforded Juror 561 and her fellow jurors ample opportunity to reveal any qualms they may have felt about remaining on the jury.

We perceive no material shortcoming in the *voir dire*. Appellant contends that the inquiry was flawed because the judge permitted jurors to return to the jury room after they were questioned instead of separating them from the jurors who were yet to be called in. Appellant argues that "an inevitable taint" resulted from jurors who presumably returned to the jury room and described the *voir dire* to the jurors who had not yet been through it. There is no evidence that this occurred, however. Furthermore, even if segregating the jurors during the *voir dire* might have been desirable, see *Hill*, 622 A.2d at 686, appellant never requested it. The judge's failure to follow such a procedure *sua sponte* is reviewable, therefore, only for plain error, which it plainly was not. Appellant's mere speculation that the inquiry was "tainted" seems to us far too weak a supposition to require reversal.

We also are satisfied that the record generated by the *voir dire* justified the judge's decision to credit the jurors' assurances and find that they were not biased or intimidated. Although, ostensibly, a fearful juror cannot be impartial, it appears that in this case, the juror overcame her fear. It is true that other jurors reported that Juror 561 was upset earlier that morning. But in response to probing questions, Juror 561 was adamant; she explained that though she had felt frightened, she now felt "pretty secure, especially after my prayer with my preacher last night with my God." Far from being afraid to remain on the jury, she insisted that she could continue to serve.[16]

---

16. In declaring that she was afraid *no longer,* Juror 561 was not like the juror in *Hill* who "declared himself of two minds—one saying he has reached his own conclusion from the extraneous contact, the other saying he can lay that conclusion aside." 622 A.2d at 685.

The extra-judicial communication was, after all, relatively innocuous. While Juror 561 was unnerved at being recognized as a juror in appellant's trial, the teenage girl who confronted her did not threaten her or overtly attempt to influence her in any way. Unlike the juror in *Hill*, Juror 561 acquired no information relevant to the trial by virtue of the contact. The encounter was brief and inconsequential; the girl's mother intervened and terminated it; and the girl then said nothing more to Juror 561. It is completely plausible that by the next day Juror 561 was no longer afraid. The judge reasonably could so find.[17]

In sum, as the trial judge's findings are clearly supported by the record, we conclude that he did not exercise his discretion erroneously in denying appellant's motion for a mistrial.

### III.

We turn to appellant's claim that he was deprived of his Sixth Amendment right to effective assistance of counsel by his trial attorney's failure to file a meritorious motion to suppress his statements on Fourth Amendment grounds. *See Artis v. United States*, 802 A.2d 959, 966 (D.C.2002) (explaining that a failure to move to suppress evidence may constitute ineffective assistance if, among other conditions, the motion would have been meritorious). Appellant argues that the police arrested him without probable cause, in violation of his Fourth Amendment rights, when they handcuffed him, held him in a police cruiser, and transported him to police headquarters for custodial interrogation. His ensuing statements, appellant reasons, would have been suppressed as the fruits of that Fourth Amendment violation, had his trial counsel made the proper motion. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 214–16, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

▬ We conclude otherwise as a matter of law. Even on the facts as appellant posits them, he did not have a meritorious Fourth Amendment motion.[18] The police did not obtain appellant's statements at police headquarters through the "exploitation" of any Fourth Amendment violation that may have occurred. *See Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

▬ The government conceded, and the trial judge assumed, that Officer Benton initially did not have probable cause to take appellant into custody—i.e., to arrest him—for the shooting of Marshall. This lack of probable cause did not render Officer Benton's action improper, for he unquestionably did have sufficient reasonable

---

**17.** Given that we uphold the judge's finding that Juror 561 was impartial, appellant cannot succeed on his secondary claim that his trial counsel rendered ineffective assistance in not moving to strike the juror (as an alternative to a mistrial) for her bias against him.

**18.** Thus, we find no infirmity in the trial judge's decision to deny appellant's § 23–110 motion without holding an evidentiary hearing. Even where, as here, such a motion is based on counsel's failure to pursue a certain course of action, a hearing may be unnecessary if the existing trial record establishes conclusively that the movant is not entitled to relief. *See, e.g., Reaves v. United States*, 694 A.2d 52, 57–58 (D.C.1997). The issue before us turns on the merits of the Fourth Amendment claim, not on counsel's reasons for not pursuing that claim. As the judge noted, appellant made "no proffer as to how an evidentiary hearing would establish any facts that would be relevant to the Fourth Amendment issue before the Court or counsel's alleged failure to file a motion to suppress." Rather, appellant based his § 23–110 motion "on the extant factual record" developed at trial and in the pretrial motions hearing, which "provide[d] an ample factual background to resolve the present issues." *Id.*

grounds to detain appellant temporarily "until a preliminary investigation either generate[d] probable cause or result[ed] in [appellant's] release." *In re M.E.B.*, 638 A.2d 1123, 1126 (D.C.1993); *see generally Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The investigation generated probable cause quickly enough: upon regaining her composure, appellant's mother told the police that she witnessed the shooting of Marshall by her son.

Appellant faults the police for giving credence to his mother's accusation, since for all they knew she might have been Marshall's assailant herself, but this criticism is unsound. "[A]s a general proposition any person purporting to be a crime victim or witness may be presumed reliable, though the police must remain alert to the existence of any circumstances which would make that presumption inoperative in a particular case." 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 3.4(a) at 211–12 (3d ed. 1996); *see Rushing v. United States*, 381 A.2d 252, 255 (D.C.1977). The surrounding circumstances known to the police in this case bolstered appellant's mother's reliability. For example, appellant's mother called the police and let them in, while appellant ignored her entreaties to open the door for the police; appellant's mother was distressed by the shooting and sought immediate medical attention for Marshall, while appellant himself appeared strangely unmoved; and appellant's mother wrapped the weapon that had been used in the shooting in a towel and turned it over to the police, while appellant responded to Officer Benton's question regarding what happened by stating, "he tried to hurt my mother." Especially in view of these attendant circumstances, the fact that the police might have viewed appellant's mother as a second possible suspect was hardly enough to render her unreliable for probable cause purposes. *Cf. In re A.L.M.*, 631 A.2d 894, 901 (D.C.1993).

With greater cogency, appellant argues that he was placed under arrest within the meaning of the Fourth Amendment *before* his mother inculpated him, i.e., before the police had probable cause to take such action against him. The trial judge found that appellant was not arrested until Detective Whalen directed that he be taken to police headquarters, which was after his mother incriminated her son. Up until that point, the judge concluded, appellant's detention was merely a *Terry* seizure. Precedent lends support to that conclusion. *See M.E.B.*, 638 A.2d at 1127–28 (upholding trial judge's determination that handcuffing a suspect and taking him in a scout car for a show-up identification did not transform an investigative detention into an arrest requiring probable cause). *But see United States v. Newton*, 369 F.3d 659, 676 (2nd Cir.), *cert. denied*, — U.S. —, 125 S.Ct. 371, 160 L.Ed.2d 262 (2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest. [Citations omitted.] Thus, a reasonable person finding himself placed in handcuffs by the police would ordinarily conclude that his detention would not necessarily be temporary or brief and that his movements were now totally under the control of the police—in other words, that he was restrained to a degree normally associated with formal arrest and, therefore, in custody.").

Nonetheless, in reaching his conclusion, the trial judge did not take into account Detective Whalen's uncontradicted testimony that, when he arrived on the scene, appellant already was under arrest. See footnote 3, *supra*. However, the precise time at which appellant's lawful detention was converted into a full-fledged arrest is not material to our evaluation of the postulated motion to suppress. What is material is, first, that the Fourth Amendment permitted the police to detain appellant on the scene for all of the short time it took

them to acquire probable cause to arrest him; second, that the police acquired probable cause during that time from appellant's mother through means independent of appellant's putative arrest; and, third, that the police acquired such probable cause *before* they transported appellant to police headquarters, questioned him, and elicited his admittedly voluntary confessions. *See Dunaway,* 442 U.S. at 216, 99 S.Ct. 2248 (holding that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest," including, specifically, the requirement of probable cause). Even if one posits that the police committed the error of advising appellant that he was under arrest prematurely— i.e., just before his mother implicated him—the error was a technicality of no practical consequence. In any case, the police would have arrested appellant just a few moments later.

■ Under these circumstances, the acquisition of probable cause through independent means was an "intervening" event [19] that cured any hypothesized illegality by severing the causal connection between that illegality and the evidence the police subsequently obtained. A number of courts, including our own, have in comparable circumstances so held. *See, e.g., Oliver,* 656 A.2d at 1172 & 1172 n. 22 (citing cases); *see also United States v. Maier,* 720 F.2d 978, 980–81 (8th Cir.1983); *United States v. Manuel,* 706 F.2d 908, 912 (9th Cir.1983); *United States v. Morris,* 451 F.Supp. 361, 366 (E.D.N.Y.1978), *remanded by* 597 F.2d 341 (2d Cir.1979), *aff'd,* 614 F.2d 1292 (2d Cir.1979). To suggest otherwise would be absurd in the present case, for it would mean that even after the police acquired probable cause to arrest appellant, they were forbidden to subject him to custodial interrogation unless they first released him and then (very promptly, lest he flee) re-arrested him. *See Morris,* 451 F.Supp. at 366 (noting that "it can hardly be the policy of the law to allow someone who is properly subject to arrest a sporting chance to escape"). Thus, we conclude as a matter of law that appellant's confessions were not the fruits of police exploitation of his illegal arrest, regardless of when appellant was arrested and even though there was no break in his detention.[20]

**19.** As the Supreme Court has explained, "in determining whether [a] confession [was] obtained by exploitation of an illegal arrest.... [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant.... The voluntariness of the statement is a threshold requirement." *Brown,* 422 U.S. at 603–04, 95 S.Ct. 2254 (internal citations omitted). "The relative importance of each of these factors in any particular case of course depends on the circumstances of that case." *Oliver v. United States,* 656 A.2d 1159, 1172 (D.C.1995) (quoting *United States v. Cherry,* 759 F.2d 1196, 1211 (5th Cir.1985)). There was no "flagrant" police misconduct in the present case, and the "temporal proximity" of the (hypothetically illegal) arrest to appellant's confessions was interrupted by the establishment of probable cause.

**20.** Lest our holding be misconstrued, we make clear that we do not adopt a *per se* rule that the subsequent acquisition of probable cause by independent means is always and in every case sufficient as a matter of constitutional law to purge the taint of an illegal arrest. Such a holding would be contrary to the Supreme Court's teaching in *Brown* that serious police misconduct or other factors may be overriding. See footnote 19, *supra.* Thus, while the independent development of probable cause is certainly a most "powerful" intervening factor, *Oliver,* 656 A.2d at 1172 n. 22, we allow for the possibility of situations in which it is not powerful enough. *See Cherry,* 759 F.2d at 1212; *see also Morris,* 451 F.Supp. at 366.

A motion to suppress appellant's statements on the ground that he was arrested without probable cause therefore would not have been meritorious. Accordingly, appellant's trial counsel did not deprive appellant of his Sixth Amendment right to effective assistance by not filing such a motion.

## IV.

For the foregoing reasons, appellant's convictions are affirmed.