*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CF-1442

TYRONE C. JACKSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-26074-09)

(Hon. Gerald I. Fisher, Trial Judge)

(Argued February 4, 2014                                   Decided August 7, 2014)

*Daniel Gonen*, Public Defender Service, with whom *James Klein* and *Sloan S.J. Johnston,* Public Defender Service, were on the brief, for appellant.

*Allen O'Rourke*, Assistant United States Attorney, with whom *Ronald C. Machen, Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, *George Pace*, and *Kathryn L. Rakoczy*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE-RIGSBY, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*:  A T-Mobile Google cell phone with a dead battery was introduced into evidence at the joint trial of appellant Tyrone C. Jackson and his co-defendant, Alex Dickens, its owner.  The cell phone was given

to the jury along with other evidence to have during deliberations. On its own, the jury managed to activate the cell phone and peruse its contents. After inquiry, the court denied appellant's motion for a mistrial and instead gave a limiting instruction. The issue on appeal is whether, in so doing, the court abused its discretion. We hold that it did not and affirm appellant's convictions.[1]

## I. Factual Summary

## A. The Conflicting Accounts

The charges in this case arose from events that took place at 2439 25th Street SE on December 9, 2009. The police discovered complainant Christopher McClain wrapped in duct tape on the floor of a vacant basement apartment. Two sharply differing stories were presented to explain the precursory events, one by McClain for the government and one by appellant for the defense, which may be summarized as follows.

---

[1] The jury convicted appellant of one count of kidnapping while armed, D.C. Code §§ 22-2001, 22-4502 (2012 Repl.), and one count of armed robbery, D.C. Code §§ 22-401, 22-4502(2012 Repl.). The jury either acquitted or hung on the several remaining counts against appellant and on all of the charges against Dickens.

McClain, a self-employed mover, testified that he went to that address around 7:30 p.m. on December 9, 2009, to provide a moving estimate for a woman named "Nikki." As he entered the building, he was dragged into the vacant apartment by appellant. There appellant, with the help of two other men who were already in the apartment, bound and robbed McClain at gunpoint. Several witnesses in the area reported they had seen men matching McClain's descriptions running from the area and police shortly found appellant by himself, out of breath and covered in sweat, not wearing workout clothes but claiming he was out jogging. Once police brought appellant to the scene for identification, McClain identified him as the man he had been "tussling" with inside the apartment. Police also stopped co-defendant Dickens who was running away from the area, but appellant could not identify him, explaining that the other assailants had been wearing masks. Dickens—who was employed as the maintenance man at the building where the incident took place and had keys to all the locks in the building, including the vacant apartment—had his wife's SUV located behind the apartment building with his wallet, the cell phone, and duct tape in a tool box in the rear cargo area. There was conflicting testimony between the officers about whether the keys were in the ignition with the motor running and the doors were open or the ignition was turned off and the doors were locked.

In sharp contrast, appellant testified that McClain, a previously convicted drug dealer, was robbed and assaulted during a drug deal, and that McClain lied about appellant's role in the incident to hide his own illegal conduct and to curry favor with authorities, given his criminal record and his other ongoing criminal matters.[2]  Appellant testified that he and McClain were acquainted through Larry McMichael, a club promoter for whom appellant worked security.  Larry called him at his home the day of the incident, asking if appellant could work that evening, and he said yes, assuming that Larry was referring to security work at the club.  When Larry called back with details, appellant learned that the job was accompanying a mutual acquaintance, McClain, to a drug transaction as "back-up."  When appellant followed McClain into the empty apartment, a man pulled a gun on McClain and himself, and a second man frisked and disarmed McClain.  A third man appeared who tried to rob and restrain McClain while the gunman kept both men in his sight until someone announced that the police were out front, causing the assailants to flee.  Appellant denied that Dickens was any of these three men.  Appellant explained that he fled the apartment before police arrived because he

---

[2]  Mr. McClain admitted that at the time of the incident in this case and his November 2009 drug arrest, he was on probation in three different counties in Virginia, and faced up to twenty years in prison if he violated probation by breaking the law.

was on probation and feared arrest. Police searched appellant but found none of the items McClain claimed were taken during the robbery.

## B. The Activated Cellphone

After deliberating for several days and sending multiple notes to the court, the jury sent a note asking: "Are the electronic contacts on Alex Dickens's cell phone admissible, such as contact lists etc.?" Before responding, the court conferred with the parties, none of which had reviewed the contents of Dickens's cell phone prior to trial because the phone's battery was dead. Everyone agreed that they needed more information. The court brought the jury to the courtroom and asked the foreperson whether the jury had already accessed the electronic contacts and was told that the jury had "gone through them." Counsel and the court talked further about what the next step should be, in the course of which appellant's counsel said "I think my request is to ask further questions about what exactly they're – what discussions have –" and the court interrupted "I can't ask them about their discussions. I think that would be an improper intrusion on the jury deliberations." The court suggested that the next step should be to retrieve the phone and find out what exactly its contents were, to which all parties agreed. At appellant counsel's suggestion, the court recalled the jury and posed an additional

question: "[w]ith regards to the cell phone, beyond the contacts, did the jury look at any other part of the cell phone?" The foreperson responded, "Yes, yes." The court then decided to allow the parties to figure out how to charge the phone and examine its contents overnight.

The next day, the court began by asking the parties what relevant information they had found on the phone. The parties determined that the only contents of potential interest to the jury were: (1) two e-mails from a person named "Larry," "in the nature of a mass e-mailing advertising a restaurant/bar on Benning Road and a specific date of an event" sent on December 4th; (2) a contact named "Larry" in the cell phone's contact list; and (3) a phone call listed in the phone's call records, showing that co-defendant Dickens's phone received a call from "Larry's" number at 3:09 p.m. on the date of the offense. There was no response to either of the e-mails, and there was no last name attributed to "Larry" anywhere on the phone.

The court then asked counsel what prejudice would result from the jury's exposure to this information. Appellant's counsel immediately asserted that the phone's contents were not in evidence and the jury should not have been allowed to consider them, and he asked for a mistrial. Co-defendant Dickens's counsel

explained that the "Larry" contact and communications were troubling because the jury could easily assume it was Larry McMichael, the alleged mastermind behind the drug-deal robbery, contrary to the assertions during trial that "there was no connection to any Larry." Appellant's counsel explained that had he known of this evidence, he would have moved for severance, and spent more time addressing co-defendant Dickens's role in the offense.

At the suggestion of co-defendant's counsel, the court decided to make still further inquiry of the jury to determine precisely what categories of information the jurors accessed on the phone. The jury responded with a note stating that it had reviewed Dickens's emails, texts, call logs and contacts list and denied having accessed any other categories. The court then stated that in its view, the only question remaining was whether to give a limiting instruction. At that point, co-defendant's counsel joined appellant in requesting a mistrial, noting the particular prejudice imposed on his client by the Larry phone number. Appellant's counsel said that, without abandoning his motion for a mistrial, he was requesting the court in the alternative to "issue a strong curative instruction and instruct [the jury] not to consider this evidence." Neither counsel asked the court to engage in any further inquiry of the jury. The court then denied a mistrial without prejudice and penned

a proposed instruction that both parties agreed to "in light of the court's ruling on the mistrial." The court gave the following instruction.

> Government Exhibit Number 76, the telephone, was introduced for two purposes only – its location where it was found and the telephone number that belongs to it. The other contents of the phone are not in evidence. And you may not consider the other contents at all in reaching your decisions in this case.

Appellant's counsel renewed his motion for a mistrial after the jury delivered its partial verdict shortly before 3 p.m., the same afternoon that the court gave the limiting instruction. The court reiterated its conclusion that the evidence on the cell phone did not "actually detract[] from your client's situation" and denied the renewed mistrial motion.

## II. Analysis

Appellant argues that the court abused its discretion, first by failing to conduct a sufficient inquiry of the jury to determine whether it had been tainted by its review of the contents of co-defendant Dickens's phone and, further by denying his motion for a mistrial and instead instructing the jury to disregard the contents

of the phone. "'The extent and type of the trial court's investigation into the improper contact are confided to the court's discretion and reviewable only for abuse.'" *Al-Mahdi v. United States*, 867 A.2d 1011, 1019 (D.C. 2005) (quoting *Leeper v. United States*, 579 A.2d 695, 699 (D.C.1990)). Juror partiality is not "'presumed' or 'imputed' from the fact alone of the juror's exposure to extraneous material." *Hill v. United States*, 622 A.2d 680, 684 (D.C. 1993). "The remedy for a claim of juror partiality or taint is a thorough inquiry by the trial judge into whether the defendant suffered *actual* prejudice." *Hill*, 622 A.2d at 684 (emphasis in original); *see Smith v. Phillips*, 455 U.S. 209 (1982); *Shannon & Luchs Mgmt. Co. v. Roberts*, 447 A.2d 37, 41 (D.C. 1982). The court must determine whether "the judgment of the jury was substantially swayed by the presence of the unauthorized evidence in the jury room." *Moore v. United States*, 927 A.2d 1040, 1063 (D.C. 2007). It is "usually appropriate for the judge to take charge of the inquiry and to take the initiative in questioning jurors and eliciting the facts." *Al-Mahdi*, 867 A.2d at 1018-19 (citation omitted). The parties, however, "must be afforded . . . a fair opportunity to help 'fashion the proper inquiry' and pose appropriate questions of their own." *id.* (quoting *Hill*, 622 A.2d at 686). "'An assessment of juror bias [may] require [ ] consideration of a number of factors, including the nature of the communication, the length of the contact, the possibility of removing juror taint by a limiting instruction, and the impact of the

communication on both the juror involved and the rest of the jury.'" *Al-Mahdi*, 867 A.2d at 1019 (quoting *Williams*, 822 F.2d at 1188-89). Ultimately, "'the extent and type of the trial court's investigation into the improper contact are confided to the court's discretion.'" *Id.* (quoting *Leeper*, 579 A.2d at 699).

This court also reviews a denial of a motion for a mistrial because of jury exposure to non-admitted evidence for abuse of discretion. *See Ransom v. United States*, 932 A.2d 510, 517 (D.C. 2007); *Moore*, 927 A.2d at 1063. "A mistrial is a severe remedy – a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefore." *Thompson v. United States*, 45 A.3d 688, 695 (D.C. 2012). "If 'the improperly admitted evidence could not have substantially swayed the jury,' the trial court did not abuse its discretion by denying appellant a mistrial." *Moore*, 927 A.2d at 1063 (quoting *Parker v. United States*, 601 A.2d 45, 53 (D.C. 1991)).

In the instant case, both the court and the respective trial counsel were presented with a difficult and delicate situation. They struggled over a span of two days (and 74 pages of transcript) on the question of the proper actions to be taken in response to the unexpected event. As already set forth in detail, the court here proceeded prudently and carefully. First, the court assessed the nature of the

communication. When the jury sent the note asking, "are the electronic contacts on Alex Dickens's cell phone admissible, such as contact lists etc.?" the court confirmed with the foreperson that the jury had already accessed the contents of the phone. Next, the court retrieved the phone from the jury, again consulted the jury as to whether they had accessed any contents other than the contacts list, and conferred further with the parties, permitting them to review the contents of the phone overnight. Then, the following day, the court asked the parties what relevant information was on the phone, and they identified the three contents of potential interest to the jury. Next, the court assessed the possible prejudice, asking the parties what prejudice they believed would result from the jury's exposure to this information. The court consulted the jury yet a third time, asking it to clarify exactly which categories of information the jurors accessed on the phone. Finally, after further discussion, the court gave a limiting instruction.

Appellant now claims that the court should have inquired further into possible prejudice, although he did not ask for any further inquiry beyond that made by the court. Appellant makes much of the fact that he asked the court to inquire into what "discussions" the jury had had about the cell phone material and the court's comment that such an inquiry "would be an improper intrusion on the jury deliberations." Appellant, however, did not challenge that comment. At no

point subsequently did either counsel suggest making any inquiries beyond what the court had made in three separate consultations with the jury, but rather pressed for a mistrial. In particular, appellant never subsequently asserted, as he argues now on appeal, that the court was obliged to individually question the jurors about "how, why, or when" the jury accessed the phone's contents and whether the jurors could disregard what they had learned. Neither of these inquiries would have involved an exploration of the "discussions" about which the court was concerned. "An objection must sufficiently articulate the objecting party's argument to preserve the claim on appeal." *Timms v. United States*, 25 A.3d 29, 36 (D.C. 2011).

Moreover, appellant's initial concern over the jury's "discussions" of the cell phone contents occurred almost at the very beginning of substantive discussion about what steps to take, before any concrete information had been obtained as to what exactly had been accessed. Indeed, a hasty inquiry at that point into the jury deliberations without further information could itself have been the subject of criticism. In any case, here, just as in *Leeper*, "[a] fair reading of the colloquy between court and counsel, suggests that defendant's counsel wanted the judge to declare a mistrial, rather than to ask additional questions." *Leeper*, 579 A.2d at 700-01. While of course the court could have very well engaged in some further

questioning, of the jury, we do not think it abused its discretion, especially in the absence of any request for further inquiry, in determining that a limiting instruction, as appellate counsel alternatively proposed, would be sufficient to remove any prejudice.

With respect to prejudice, "[f]ollowing a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, and the findings of fact underlying that determination are entitled to "great deference." *Leeper*, 579 A.2d at 698 (citations omitted). We see no basis to second-guess the court's determination, made by one intimately familiar with the trial proceedings, that with the limiting instruction the material found on the cell phone would not and did not "substantially sway" the jury. *Moore*, 927 A.2d at 1063. Even if the evidence was taken to establish a link between Dickens and McMichael, the degree to which this link undermined appellant's (as opposed to Dickens's) defense remains questionable. Indeed, this evidence would seem to corroborate appellant's theory of the case that he was a victim and there was a link between McMichael, who allegedly orchestrated the attack, and appellant's attackers, which Dickens could have facilitated. This was precisely the court's observation when it stated, "I don't see how the evidence connecting Mr. Dickens stronger [sic] to these events

actually detracts from your client's situation."

Furthermore, unlike *Hill v. United States*, on which appellant relies, the link between Dickens and McMichael was not the "primary factual issue before the jury," or critical to appellant's defense, as was the identification issue in *Hill* that was implicated by the juror's visit to the crime scene the night before deliberations to inspect the lighting conditions himself. *Hill*, 622 A.2d at 884-85. Here, the major issue before the jury was what role appellant had in the events—whether he participated in the assault, or was a victim himself. It is difficult to see how a possible link between Dickens and Larry McMichael would have significantly altered the jury's view of that issue.

Finally, the jury's examination of the cell phone was not the result of any advertent misconduct or impropriety, as the phone was an exhibit admitted into evidence without objection or limitation. The "inference of prejudice is significantly weaker than in cases where the contact was improper rather than innocent." *Leeper*, 579 A.2d at 699 n.9. The inference is especially weak here given the jury's decision not to convict co-defendant Dickens on any count. The jury's verdict suggests it followed the court's limiting instruction to disregard the contents of the phone. We "presume that a jury follows the court's instructions,

absent any indication to the contrary." *Lewis v. United States*, 930 A.2d 1003, 1008 (D.C. 2007).

For these reasons, the court's decision to instruct the jury rather than declare a mistrial was not an abuse of discretion.  Accordingly, the judgment of conviction appealed from must be

*Affirmed.*