**Otis L. RANSOM, Appellant**

v.

**UNITED STATES, Appellee.**

No. 04–CF–316.

District of Columbia Court of Appeals.

Argued Dec. 13, 2006.
Decided Sept. 20, 2007.

Jonathan Fellner, for appellant.

B. Patrick Costello, Jr., Assistant United States Attorney, for appellee.

Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, David B. Goodhand, Denise Clark, and Elizabeth Gabriel, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ and REID, Associate Judges.

RUIZ, Associate Judge:

This appeal arises out of appellant's conviction of heroin distribution within one thousand feet of a school, in violation of D.C.Code §§ 48–904.01(a)(1), –904.07a (2001). The question before us is whether the trial court erred in refusing to grant a mistrial after it was alerted to the presence of a piece of paper found in the jury room containing information about the times the sun set around the date of the crime, which occurred at 5:45 p.m. on February 25, 2003. Appellant argues that the trial court failed to conduct an adequate inquiry into potential juror bias resulting from their contact with the extraneous information and that a mistrial should have

been granted because the information—which was not admitted or tested at trial—prejudiced him. We conclude that the trial court conducted a sufficient inquiry and did not abuse its discretion in denying appellant's request for a mistrial. We affirm.

## I.

### FACTS

#### A. *The Evidence at Trial*

On February 25, 2003, at approximately 5:45 p.m., three officers of the Metropolitan Police Department (MPD) were at the 3800 block of 9th Street, Southeast, Washington D.C., as part of a planned undercover drug operation. Officer Alfred Myers was driving an unmarked police car, while the other two, Investigators Anthony Greene and Anthony Commodore, were walking in the neighborhood dressed in civilian clothing and attempting to buy illegal drugs as a part of the "buy-bust" operation.

On that evening, Investigator Greene testified, he approached a person, whom he later identified as appellant, and asked him for heroin using the street term "blow." Investigator Greene paid $30.00 in prerecorded bills and in exchange received three small bags containing heroin,[1] which he testified came from the seller's front, right coat pocket. According to Investigator Greene, the purchase took approximately two minutes and he stood "face-to-face" with the seller at a distance of approximately three feet during the transaction.[2]

After he purchased the drugs, Investigator Greene walked away and gave a pre-arranged signal to Officer Myers, who had been monitoring the transaction from an unmarked police car, to convey that the purchase had been completed. Officer Myers then broadcast over an unrecorded police channel a "lookout" for the seller, providing a description of his clothes and other defining features to the arresting officers. Officer Leroy Rollins and other members of the arrest team in the neighborhood spotted a man matching the description provided by Officer Myers and apprehended appellant within minutes on the same block.[3]

Officer Myers met up with Investigator Greene approximately one minute after the transaction. After learning that the arresting officers had apprehended a suspect, Officer Myers drove his vehicle past the police car where appellant was being detained. Investigator Greene identified appellant as the seller,[4] and he was placed

---

1. The contents of the bags were later analyzed by the DEA and were found to contain heroin.

2. Investigator Greene testified that the drug buy took place across the street from Draper Elementary School, at a distance of 200 feet from the school.

3. Officer Rollins also testified that the lookout given by the observing undercover officer indicated that the seller had gone inside a house and that the arrest team should wait until the seller came back out of the house. Officer Rollins and the arresting officers waited five minutes before they were told to apprehend appellant. Officer Myers denied seeing appellant walk into a house, however, and Investigator Greene testified that immediately after the purchase, he walked out of the area where the transaction had taken place, without mentioning whether appellant had entered a house.

4. According to Investigator Greene, it was "still daylight," whereas Officer Rollins testified that it was "dusk," but that the street was illuminated with "high-intensity streetlights." Officer Myers testified that Investigator Greene was approximately eight to twelve feet from appellant when he made the identification, but, according to Investigator Greene, he was some fifty feet away when he identified appellant.

under arrest. In a search incident to arrest, Officer Rollins recovered $32.00 from appellant's front, right pocket, $30.00 of which were found to be the MPD prerecorded bills used by Investigator Greene to purchase the drugs.

Contradicting the officers, appellant testified that on February 25, 2003, upon leaving his friend Tasha's house between 4:30 and 5:00 p.m. to pick up his children, the police stopped and arrested him. Appellant testified that the police searched him and took between $30 and $40 from him, which he had earned working. Appellant denied possessing or selling heroin that day.

### B. *Discovery of Extraneous Information in Jury Room*

At trial, shortly after the alternates were dismissed and approximately five minutes after the jury had retired to deliberate, the trial court received a note from the jury foreperson about a piece of paper that had been found in the jury room. In the note, which enclosed the piece of paper,[5] the foreperson asserted that no juror had read what was on the paper, but that one juror "saw [it]."[6] The trial court convened the parties to alert them to the situation.[7] The trial court examined the piece of paper and informed the parties that the piece of paper "is ... essentially a list of the times of sunset—the rise and set for the sun for 2003. And one time is circled ... it is the time of sunset for February 23, 2003." Judge Leibovitz also

described the print on the paper as "minute." The court then began a hearing process to discern where the piece of paper had come from and what, if anything, each juror had heard about or seen directly from the piece of paper.

Judge Leibovitz first questioned, separately, the foreperson and Juror 367 (who found the piece of paper) in the presence of counsel and permitted counsel to question them directly. The foreperson testified that "two to three minutes" after the jurors had returned to the jury room to begin their deliberations, Juror 367 brought to everyone's attention the existence of a piece of paper that she described to the other jurors as "an astrologer's table." See note 10, *infra*. The foreperson explained that she did not look at the contents of the piece of paper herself. Rather, after Juror 367 suggested that it was likely they should not be in possession of this paper,[8] the foreperson led the effort to draft a note to the judge informing her of what they had found and enclosed the piece of paper with the note.

Juror 367's testimony was similar to the foreperson's, but she added that she read only the title of the paper, and that, while she noticed some numbers circled on it, she did not "know what the numbers were" and looked at it for "only seconds." She corroborated the foreperson's testimony that the jurors' discussion about the paper was limited to her comment that it "was a timetable of some sort" and to how to draft the note to the judge. Juror 367

---

5. The piece of paper found in the jury room is not part of the record on appeal.

6. The full text of the note to the judge read:

> Judge—upon entering the jury room a closed piece of paper was found. One jury member saw the heading, but did not read what was enclosed. This paper was not here before our last time in the jury room.

7. At this point, defense counsel requested a mistrial which the trial judge denied as being premature.

8. According to the foreperson, Juror 367 "opened the note and looked at it and said this is a table of some kind and then she closed it. She said I don't think we're supposed to see this. She said, we need to write the Judge a note."

also told the other jurors that the paper could "amount to jury tampering,· or something."

Upon a request from the parties, Judge Leibovitz agreed to question each of the other jurors separately to determine if there was any possibility of juror bias. After conferring with the parties, the judge developed a series of questions which she asked each of the jurors: whether the juror had seen the contents of the paper, whether the juror knew where it came from, and whether the juror could continue to be fair and impartial and not speculate about the contents of the paper.[9] In response to these questions, every juror responded that he or she could decide the case in a fair and impartial manner based solely on the evidence introduced at trial. Two jurors noted that they had seen "numbers" on the piece of paper but could not actually read the contents of the paper.[10] None of the jurors knew how the piece of paper had found its way to the jury room.

At the close of the *voir dire*, defense counsel again requested a mistrial. The judge denied the request, finding that "[t]here is no basis in the testimony from each of these jurors to grant a mistrial, and there is no indication whatsoever that the piece of paper discovered is in any way going to influence the jury in this case." The judge suspended court proceedings for the day and allowed the jury to resume deliberations the next day. Before she did so, she instructed the jury that "you are to put out of your minds the discovery of the piece of paper in the jury room, that you are not to speculate about what was on it, and you are not to speculate about where it might have come from." After the jury deliberated for approximately two hours, it announced its verdict finding appellant guilty of distributing heroin within the school area designated in the statute.

## II.

## ANALYSIS

The impartiality of the jury in a criminal trial is a primary safeguard of our criminal justice system. Two essential ways of preserving the jury's impartiality are exclusion of jurors who have a personal bias against or in favor of a party and shielding of the empaneled jurors from evidence or information about the matter at issue that has not been presented pursuant to evidentiary and other rules that govern a criminal proceeding. When ju-

9. Defense counsel requested that the trial court also inquire as to (1) whether the jurors had discussed whether or not the paper constituted jury tampering and (2) whether any of the jurors had a discussion about the origin of the paper. The judge declined to ask these questions, explaining that both questions would invite the jurors to speculate, which she concluded "was the very process [she did not] want them to undergo."

10. This testimony is consistent with the trial judge's observations that the writing on the paper was "minute" and that it would take a few minutes to "glean [] any information from it"—a comment defense counsel conceded was true. The jurors variously described it as a "table, some kind of table[,] . . . an astrologer's table[,] . . . a time table of some sort . . . . [containing] a whole bunch of numbers . . . [on the] upper lefthand part [which] were column headings [which corresponded to] months." Juror 367 testified that "there was ink on the table, something was circled[,] . . . numbers . . . were circled, but I don't know what the numbers were." She further stated that the "title . . . sort of explained what the document was" but she could not remember precisely at the time. Juror 367 thought the table looked like a "tide chart." Juror 636 described the paper as showing "horizontal lines." Juror 119 could only discern "lines which I thought it was a form." And Juror 42 described "like numbers like there could have been like a [black] board with algebra on it for all I know."

rors are exposed to "extra judicial information," the trial court must address whether the jury's deliberations have been tainted by evidence not presented during the course of the trial. *See Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) ("The integrity of jury proceedings must not be jeopardized by unauthorized invasions."); *West v. United States*, 866 A.2d 74, 82 (D.C.2005) ("The right to trial by [an] impartial jury is 'fundamental and deeply embedded in American jurisprudence.'") (quoting *Hughes v. United States*, 689 A.2d 1206, 1207 (D.C.1997)).

■ While the Supreme Court has emphasized the importance of jury impartiality, it has also cautioned that not every potential threat of juror bias automatically requires a new trial. The controlling question is actual prejudice. As stated in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), a landmark case on procedures required when juror impartiality is questioned,

> [D]ue Process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Id.* at 217, 102 S.Ct. 940.

■ If a juror's impartiality is in question, the Supreme Court has required, *see Remmer*, 347 U.S. at 230, 74 S.Ct. 450

(vacating a conviction due to the failure of the District Court to hold a hearing to investigate potential juror bias), and we have recognized, that the correct remedy is for the trial court to hold a hearing on the potential bias. *See Leeper v. United States*, 579 A.2d 695, 698 (D.C.1990) ("The remedy for allegations of juror bias is a hearing to determine whether the misconduct actually resulted in prejudice.") (citations omitted).

■ Several guidelines have been established for such a hearing. First, the trial court should hold the hearing with counsel present, and allow the parties to contribute to the questioning of the affected jurors. *See Carter v. United States*, 497 A.2d 438, 443 (D.C.1985) (counsel should be given an adequate opportunity to express their concerns to the judge); *United States v. Butler*, 262 U.S.App. D.C. 129, 134, 822 F.2d 1191, 1196 (1987) (holding that a hearing on potential juror bias "should not be conducted *ex parte*, but it also need not be conducted as a full evidentiary hearing, and the inquiries put to the juror need only be sufficiently detailed to permit the judge to determine whether any prejudice is likely to result") (internal citations omitted); *United States v. Williams*, 262 U.S.App. D.C. 112, 128, 822 F.2d 1174, 1190 (1987) (recognizing that *Remmer* requires "notice to the accused of any juror contact, and an opportunity for the accused to participate in any proceeding to determine its impact").

While it is appropriate for the parties to play an active role in a hearing to inquire about potential jury taint, we have recognized that the trial judge retains the primary role in conducting the hearing and setting the boundaries of inquiry. *See Al–Mahdi v. United States*, 867 A.2d 1011, 1019 (D.C.2005) ("[I]t is usually appropriate for the judge to take charge of the

inquiry and to take the initiative in questioning jurors and eliciting the facts."); *Butler,* 262 U.S.App. D.C. at 134, 822 F.2d at 1196 (noting that "the trial judge has broad discretion to fix the exact procedures by balancing the need to make a sufficient inquiry against the concern that the inquiry does not create prejudicial effects by unduly magnifying the importance of an insignificant occurrence").

 When the possibility of juror taint has been raised, "the evidence of record must justify a high degree of confidence that the likelihood of juror partiality has been rebutted," for the trial to proceed. *Al–Mahdi,* 867 A.2d at 1019; *see Hill v. United States,* 622 A.2d 680, 684 (D.C.1993) ("[A]ll reasonable doubts [about the juror's ability to render an impartial verdict] must be resolved in favor of the accused." (quoting *Williams,* 262 U.S.App. D.C. at 128, 822 F.2d at 1190)). Juror bias is not, however, presumed or imputed from the fact alone of the juror's exposure to extraneous material. *See Hill,* 622 A.2d at 684. Rather, the trial judge must determine if the defendant suffered "actual prejudice." *Id.* (discussing the requirements laid out by the Supreme Court in *Smith*); *see also Harris v. United States,* 606 A.2d 763, 765 (D.C.1992) (noting that "[w]here a claim of juror partiality is made, 'the remedy . . . is a hearing in which the defendant has the opportunity to prove actual bias' ") (citations omitted). If the trial court finds that the defendant has suffered actual prejudice, then it is required to either declare a mistrial, *see Parker v. United States,* 757 A.2d 1280, 1287 (D.C.2000), or "if possible, to grant other adequate relief (such as excusing the affected juror)." *Al–Mahdi,* 867 A.2d at 1019.

 In determining whether a juror's contact with extra-judicial information has resulted in actual juror bias, the government bears the burden of establishing that the juror's contact with extraneous information did not prejudice the defendant. *Remmer,* 347 U.S. at 229, 74 S.Ct. 450; *Hill,* 622 A.2d at 684. That said, "[t]he burden of establishing harmlessness, which is placed on the government, is made less demanding by the trial judge's participation and use of all the tools necessary to evaluate the relevant facts." *Butler,* 262 U.S.App. D.C. at 134, 822 F.2d at 1196.

 Because of the trial court's first-hand participation, "[f]ollowing a proper hearing, the determination of juror bias or prejudice lies particularly within the discretion of the trial court, reversible only for a clear abuse of discretion, and the findings of fact underlying that determination are entitled to 'great deference.' " *Hill,* 622 A.2d at 683–84 (quoting *Leeper,* 579 A.2d at 698) (additional citations omitted); *see also Al–Mahdi,* 867 A.2d at 1020 ("Inasmuch as the substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact, . . . we must accept the trial court's findings thereon unless those findings are clearly erroneous.") (internal quotations and citations omitted). As we noted in *Hill,* "[o]ur review is deferential because the question of prejudice turns substantially on the judge's appraisal of the juror's demeanor, and is therefore one about which the trial judge is especially qualified to render a sound opinion." 622 A.2d at 684 (quoting *Leeper,* 579 A.2d at 698).

Appellant contends that the trial court should have declared a mistrial because the piece of paper contained information that constituted "crucial extra judicial information," and "concern[ed] the primary factual issue before the jury." Appellant argues that if a court finds that the extraneous information fits either definition,

"there is a real possibility of prejudice" that requires a mistrial.[11]

Appellant presents little evidence or legal precedent to support his arguments other than an assertion that *Hill,* in which this court reversed a drug conviction because of juror bias, is controlling. 622 A.2d at 686. In that case, which also involved a buy-bust operation, on the night before deliberations were set to begin, a juror drove past the place where the transaction took place in order to personally observe the lighting conditions. Once the trial court became aware of the juror's independent viewing of the scene, the judge questioned the juror and concluded that while the juror admitted to "dr[awing] [his] own conclusion as to what [he] felt the lighting condition was," he could still remain impartial and could decide the case based on the evidence admitted at trial. *Id.* at 682–83. On appeal, we reversed because while the juror stated that he could decide the case based solely on the evidence admitted at trial, during *voir dire* he had "declared himself of two minds— one saying he ha[d] reached his own conclusion from the extraneous contact, the other saying that he [could] lay that conclusion aside." *Id.* at 685. The juror's own admission, we held, was enough to show bias, and, therefore, a new trial was warranted. *See id.* at 686.

There are significant differences, however, between the importance of the extrajudicial information gleaned in *Hill* and that in this case. The chart of sunset times was not "crucial" to a "primary factual issue," unlike in *Hill,* where the lighting conditions were a significant factor in the reliability of the identification of the suspect and the defense was that other black men at the scene matched the description of the suspect, which could have led to a misidentification of defendant as the seller. *Id.* at 682.[12] Here, appellant's defense was a general denial that relied exclusively on his assertion—obviously rejected by the jury's verdict—that although he was at a friend's house close to where the officer had purchased the drugs, he neither possessed, nor sold, heroin that day. He had no explanation for how he came to be in possession of the pre-recorded bills minutes after the drug buy, other than to say that he had earned the money by working. Appellant did not argue that other men in the surrounding area also matched the suspect's description, and although there were some inconsistencies in the officers' description of the events, see notes 3 and 4, *supra,* the officers' identifications were not significantly impeached. Moreover, in *Hill,* only one police officer was able to identify the defendant, and that officer was in contact with him for only approximately forty seconds. *See id.* at 681–82. In the present case, however, Investigator Greene and Officer Myers saw appellant and both were able to positively identify him. Investigator Greene, in particular, testified that he stood "face-to-face" with appellant at a distance of approximately three feet for about two minutes, over twice as long as the transaction in *Hill,* making his identification of appellant less prone to error. Significantly, Officer Rollins testified that there were "high intensity lights" where Investigator Greene purchased the drugs and the two officers identified appellant, so the natural

---

**11.** In support, appellant cites to *Butler,* 262 U.S.App. D.C. at 134, 822 F.2d at 1196, and *United States v. Delaney,* 732 F.2d 639, 642 (8th Cir.1984). We came to the same conclusion in *Hill,* 622 A.2d at 685.

**12.** In *Hill,* the trial judge believed that the lighting conditions were "important, even central to at least one of the facts to consider in weighing the identification testimony," which played a key role in Mr. Hills's defense. 622 A.2d at 683.

lighting conditions at the crime scene, which could have been extracted from the table of sunsets, were not as significant in determining the reliability of the officers' identifications. Because the natural lighting conditions in this case were not "crucial" to the reliability of the officers' identifications of appellant, appellant's reliance on *Hill* is misplaced.

Another important distinction between *Hill* and the present case involves the nature and extent of the juror's contact with the extra-judicial information. In *Hill*, a juror made a deliberate decision to seek out additional information that he evidently felt was necessary and/or useful to a determination of guilt.[13] The juror admitted that while he did not spend much time at the crime scene, the experience had affected his understanding of the case.[14] In this case, however, there was no evidence that any of the jurors (other than the alternates, who had already been excused) brought the paper into the room, which supports the judge's conclusion that no juror purposefully sought out this information. Furthermore, unlike in *Hill*, all the deliberating jurors told the judge unequivocally that to the extent that they heard about or saw the paper, it would have no effect on their ability to be fair and impartial and to weigh only the evidence introduced at trial. *See Hill*, 622 A.2d at 687 ("While some courts have doubted the reliability of a juror's declaration of his or her ability to render an unbiased verdict, 'the Supreme Court has settled that such testimony is *not* inherently suspect, for a juror is well-qualified to say whether he has an unbiased mind in a certain matter.'" (quoting *Butler*, 262 U.S.App. D.C. at 134–35, 822 F.2d at 1196–97) (additional internal quotations and citations omitted)); *see also Al–Mahdi*, 867 A.2d at 1019 ("A juror's assurance of impartiality has probative value...."). Most strikingly, each juror, with the possible exception of the juror who found the paper, had little to no direct knowledge of the paper's contents and there is no evidence to suggest that *any* of the jurors was able to discern from the chart what the time of sunset was on the date of the crime or the surrounding dates,[15] probably because their contact with it was very brief, or because they could not take a good look at it, or as the trial judge put it: "the print on this is minute. I don't think you can glean information from even actually scrutiniz[ing] it for a few minutes." These factors further distinguish this case from *Hill* and support the trial judge's decision to deny the request for a mistrial, because the hearing disclosed no evidence that appellant was prejudiced by the jury's limited contact with the piece of paper.

▪ Appellant also argues that he was deprived of his right, pursuant to *Remmer*, to conduct a full inquiry about the juror contact. Specifically, appellant faults the trial judge for refusing to ask the additional questions he requested concerning the jurors' potential discussions of jury tam-

---

13. As we stated in *Hill*, "the lighting was undeniably an important issue *for this juror*, who purposely 'went to the area' the night before deliberations to inspect those conditions himself." 622 A.2d at 685.

14. As noted, the juror stated that his investigation had allowed him to "dr[aw] [his] own conclusion as to what [he] felt the lighting condition was." 622 A.2d at 682.

15. We have recognized that if extra-judicial communication is found to be "relatively innocuous," then it is less likely that the defendant has been prejudiced by the juror's exposure to it. *See Al–Mahdi*, 867 A.2d at 1022; *accord, Waller v. United States*, 389 A.2d 801, 806 (D.C.1978) ("We observe that the incident which occasioned inquiry in the instant case was innocuous compared to those found not worthy of mistrial....").

pering and the possible origin and content of the piece of paper. Supporting his contention, appellant cites the interpretation of *Remmer* in *Williams, supra,* in which the D.C. Circuit stated that "[w]hat *Remmer* demands is notice to the accused of any juror contact, and an opportunity for the accused to participate in any proceedings to determine its impact." 262 U.S.App. D.C. at 128, 822 F.2d at 1190. We, however, see no indication in the record that the trial judge's hearing did not meet the broad requirement set out in *Remmer.*

The trial judge took the first and most important step required by *Remmer:* upon learning of the extraneous information in the jury room, she held a hearing at which counsel for both parties were present. *See Remmer,* 347 U.S. at 229–30, 74 S.Ct. 450 ("The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof on the juror and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."); *Waller,* 389 A.2d at 807 n. 5 (citing *Remmer*); *see, e.g., Butler,* 262 U.S.App. D.C. at 134, 822 F.2d at 1196 (affirming trial judge's decision not to declare a mistrial in part because the judge followed the proper procedures, including holding a hearing "in the presence of opposing counsel, all of whom were given a chance to make suggestions on how to proceed"). In addition, the judge provided defense counsel with the opportunity to ask questions directly to the two jurors with the most information concerning the piece of paper, and gave counsel the opportunity to comment and to suggest questions to be asked to the remaining jurors. The judge questioned each of the jurors to ensure there was no conflicting evidence or signs of bias or prejudice. *See Butler,* 262 U.S.App. D.C. at 134, 822 F.2d at 1196 (finding it relevant that the "affected juror was brought into the hearing and extensively questioned"); *Al–Mahdi,* 867 A.2d at 1021 (holding that the trial court engaged in a "proper investigation" of the issue of potential juror partiality in part because the *voir dire* examination was "thorough and probing"). With respect to the specific questions proposed by defense counsel, see note 9, *supra,* the trial court was understandably concerned that they would lead the jurors to speculate, rather than elicit factual information about the circumstances surrounding the discovery of the paper in the jury room and what the jurors knew of its content. Consistent with that concern, the trial judge instructed the jurors to not speculate about the content of the piece of paper and to focus their decision-making exclusively on the evidence introduced at trial. These steps adequately met the requirements of *Remmer* and in our view constituted a comprehensive effort to investigate and guard against the possibility of prejudice. Finding no error in the trial court's decision to deny the request for a mistrial, we affirm the conviction.[16]

*Affirmed.*

---

**16.** Appellant had asked this court to take action to prompt the trial court in a then-pending D.C.Code § 23–110 motion for a new trial based on ineffective assistance of trial counsel. We have been informed that the trial court has already made a decision on the motion, so we consider appellant's request moot.